May it please the court. On remand from this court, the trial court erred in four major respects. Each one of these is a substantial question of substantial importance. I'm somewhat cowed by the number of issues to be raised and the amount of time available, but I want to be responsive to the court's questions. Perhaps it would help things if I could just say a sentence or two that establishes our fundamental position on each of the four issues, and then obviously be guided by whatever you want to hear about. You may assume that we've read the briefs. I was hoping so and assume so. First, the trial court erred in rejecting Medtronic's ensnarement defense, that is, in denying a motion for judgment of non-infringement as a matter of law, contrary to the Supreme Court's teachings in KSR. Independently, it erred by refusing to let the jury decide that issue contrary to the Seventh Amendment. Second, it erred in permitting an eye-popping $150 million in lost profits on DePuy's screws because the evidence showed that there was no demand whatsoever for DePuy's claimed invention as opposed to polyaxial screws generally. And independently, the court erred by improperly preventing Medtronic from explaining to the jury why it didn't produce its bottom-loaded design around until 2000. Third, the court erred in allowing $77 million of lost profits on products that neither compete nor function with the patented technology. This court's opinions in right height and American seating demonstrate the error of the court's ruling. Indeed, in this case, DePuy could not even identify what those so-called pull-through products were, and it introduced no proof whatsoever that it had the capacity to manufacture any more of them than it already did. And finally, as to the fourth issue, the court erred in sanctioning Medtronic for pursuing a defense under the reverse doctrine of equivalence. That defense, which fully accepted this court's construction of the pressed-against limitation of the independent claim, was disclosed to the court and DePuy before trial. It was a defense that was reasonably based both in the law and in the facts, and it was thus well within the bounds of fair advocacy. Now, as to ensnarement, which is the issue of non-infringement, the plaintiff's expert in this case conceded, and the trial court agreed, that combining two prior art references, Pruno and Anderson, would have produced the quote, predictable outcome of a rigidly-locking pedicle screw that's encompassed by the hypothetical claim. That should have been dispositive under KSR, which requires a finding of obviousness when a combination of known mechanical objects yields an entirely predictable result. In rejecting that conclusion, the trial court made two errors of law. First, he declined to consider the Anderson patent pertinent, even though it is unquestionably from the same field of endeavor as the Pruno patent and the 678 patent in this case, and this is important for standard of review. The trial court never made a finding to the contrary. So there is an error of law in refusing to consider the Anderson patent as analogous art. Second, the trial court held that the specification in the Pruno patent did not defeat any motivation to combine the two references, even though there was uncontested testimony that established that there were many surgeons and many orthopedic engineers who want increased rigidity, and there were other references, the 458 patent and the 602 patent, that actually teach that increased rigidity and reflect the fact that persons of skill in the art demand it. But wasn't it important in Pruno that there not be rigidity in the interconnection between the pins and the screws? Well, as this court has construed Pruno in the Cross litigation, and as this court pointed out in Cross, claim five, independent claim five of the Pruno litigation includes and claims an entirely rigid ball and socket joint. Now, the way the court got to that interpretation was not by the language of the claim itself, because the claim doesn't say rigid. The court looked to the specification and concluded that although the preferred embodiment that is reflected in the 555 touted as an advance the absence of what's called micro motion between the bone and the screw set or the receiver, nonetheless, claim five did not or included a perfectly rigid set. That was an interconnection, though, between the shoulder and the bone, not necessarily between the pin and the screw. The rigidity at issue in this case is precisely the same. That is, what the question is whether there is motion or any flexible motion between the bone and the receiver member that is being attached to it. There are some surgeons and engineers that want no micro motion at all. There are other surgeons, including Pruno, at least in the 555 patent, that say we want to have a little bit of this because it decreases the strain on the screw bone interface. But my point about Pruno, Judge Lynn, is twofold. First of all, as construed by this court, it does not teach away from some degree of rigidity. Second of all, the hypothetical claim in this case doesn't require complete rigidity. The point is that you can have a compression member that presses down and depending on how hard it's torqued, the amount of rigidity can be modulated, as was explained at trial. But the more fundamental point about Pruno, and the point I've just been making is why we think the court clearly erred as a finding of fact in finding that Pruno teaches away. But our legal point here, on which we get de novo review, is under KSR and under this court's recent decision in Rentrop, in looking at motivation to combine two prior art elements, you aren't limited to the teachings in the patents covering those two elements. There was plenty of motivation already among persons of ordinary skill in the art to increase rigidity. There were patents that reflected that and taught it. As the Supreme Court said in KSR, any need or problem known in the field can provide a reason for combining the elements in the matter claimed. And as we reflected in the 28J letter that we filed last week, in Rentrop, this court again reaffirmed that quote, motivation to combine may be found in the nature of the problem to be solved. And so even if it were true, as a matter of fact, that Pruno teaches away, that wouldn't defeat the motivation. And here, as KSR teaches, when there is a combination of known mechanical objects that yields a predictable result, the combination is obvious. And their witness, Professor Antonsen, conceded that and the trial court agreed. And so we think as a matter of law, the finding of infringement should be reversed. But surely, surely if it isn't, we were entitled, under the Seventh Amendment, to a jury trial on that issue, just as DePue demanded and received a jury trial on its affirmative doctrine of equivalence. That's our case on point one. But isn't, I think we're going to ask the same question. Isn't ensnarement a question of law? And isn't that what Wilson Sporting Goods said? Ensnarement is a question of, well, this court has said that it's a mixed question of law and fact, or it's a question of law that depends on subsidiary findings of fact. But the point is, it's just like obviousness. And that's essentially, it's the infringement defense, it's the infringement defense analog to an obvious challenge to validity. And just like obviousness, which is a question of law for the court, supported by facts, there is an absolute right to a jury trial on the issue, or at least as to the facts that underlay the legal conclusion. And we think this is an open issue in this court. It's an open issue in the Supreme Court. We think that just as they were entitled to put their doctrine of equivalence case to the jury, we were also entitled to put our ensnarement defense to the jury, which is simply that under the hypothetical claim that their equivalent seeks, it would have been obvious under the prior art and would not have been patented. This is different from obviousness, which of course is a defense established by clear convincing evidence and all. But this is a question of infringement. And the question of, it's sort of a legal impediment to the establishment of infringement that is the plaintiff's burden. And it seems to me is quite different from obviousness in whether the jury is entitled to address this. I take your point, Judge Lennon. I'm afraid I've exhausted all the available resources I have to argue this point, except that like obviousness, the non-infringement by ensnarement is incredibly fact dependent. It almost always has expert witnesses. It almost always has testimony about what the prior art was. And just as in obviousness, the ultimate conclusion of law, whether the patent is or isn't valid or patentable, is exactly the same here. Now I acknowledge that this court has said under Warner Jenkinson that prosecution history estoppel is to be tried to the court, even though it too is a defense to the doctrine of equivalence. But prosecution history estoppel is essentially looking at a document in the PTO and construing its meaning and scope just as a court, rather than a jury, ordinarily looks at a contract and makes that determination. I mean, I don't want to take up all of my time and all of your time by arguing this point. We think we are entitled to judgment as a matter of law on ensnarement under KSR because of their concession in the trial court's finding that the combination of these two very well-known references was yielded the predictable outcome that is, in fact, the hypothetical claim. I should make one point clear about the Anderson reference. The Anderson ‑‑ the court understood that the test that it had to consider Anderson if it was analogous art. And it recited the fact that art can be analogous if it is either from the same field of endeavor or reasonably pertinent to the problem to be solved. The court then went on to find that the latter was not satisfied but made no finding on the former. And that is an error of law. In fact, Anderson is absolutely from the same field of endeavor. There is really no serious argument to the contrary. And it is also reasonably pertinent. The field of endeavor is always orthopedic devices or I suppose at most bone fixation devices. The parties agreed that a person of ordinary skill in the art was a spinal surgeon or an engineer with experience in orthopedic devices. Long bone fixation patents are cited all the time in spinal devices including with respect to the 678 patent at issue here and vice versa. External bone fixation devices are cited as references for internal fixation devices and vice versa. And Anderson itself has repeatedly been cited as a reference for internal spine fixation devices. So the argument that this is not from the same field of endeavor is completely unavailing. And indeed the argument that it is not reasonably pertinent to the problem is unavailing. The problem is how to rigidly clamp a ball and socket joint in a bone fixation device. That is exactly what Anderson teaches. And in fact one of the puzzlements in this case is why you even need Anderson. I mean we are talking about a simple mechanical device. We have a ball and socket joint and the question is how do you make it more rigid. Obviously a way to make it more rigid is to apply compression to the joint itself. And that Anderson therefore is reasonably pertinent. If I can just say a few questions about one of the other three issues in the case. I think we are going to talk about the damages issue. Yes. It will take a few more minutes. There are two damages issues in this case. They are both lost profits. One relates to lost profits as to the screw sets, that is the vertex sails that the court found would have been made by DePue absent the infringement. There is a separate issue on the so-called pull through lost profits as to which I think our, we think the outcome is absolutely controlled by right height and American seating. And the point about the $150 million in lost profits on the screw set sails is really a very important issue in this court and in this case. The evidence in this case was absolutely unequivocal. It came from their expert testimony, Dr. Teselli, that the claimed invention, that is the features of the 678 patent, are completely irrelevant to customers, to the surgeons who use these products and to the hospitals that purchase them. What this court held in the prior appeal distinguished the patented device from the unpatented device was the fact that, the court held that our bottom loaded screw, that is a screw that is placed into the receiver from the bottom rather than from the top, kept it from infringing. The testimony in this case was that neither hospitals nor surgeons care how the screw is inserted, nor do they even know because all of these screw sets, the ones that Medtronic sells and the ones that DePue sells, always come to the hospitals preassembled. They don't know and they don't care. What they care about is that there is a polyaxial screw that can be rigidly fixed. And for lost profits purposes under Panduit Factor 1 and Panduit Factor 2, the profits have to be shown to be attributable to the patent, that is to why somebody bought the product. That's essential to prove the but brain processing among many other cases. In fact, one of the other cases, Judge Lynn, I think is the opinion you wrote for the court in Ferguson-Borregaard, where you said that they must show, quote, the patent related feature is the basis for the customer's demand. Similarly in Slimfold, which is one of the earlier cases, the court held that the plaintiff must, quote, show that buyers of bifold metal doors specifically want a door having the advantages of the Ford patent rather than any other patent that covers the folding doors. I suppose the question then is, how far do you go in parsing this out as to what the patented feature is? Is it the overall feature, in this case the polyaxial operation, or is it the way in which the polyaxial configuration is achieved? Well, I think it's fair to say that it's the claimed invention. That is, it's what distinguishes an infringing item from a non-infringing item. And in this case, the testimony was no one cares or knows. Now the only other, I'm puzzled about this, the only other thing I can think of looking at this court's cases is sometimes this court's opinions talk about the advantages of the patented invention, which is a little weird because patents aren't required, they have to be novel, but they aren't required to tell what the advantages are. But in this case, again, it is an easy case because the patent throughout indicates that the advantage of this patented design is that it allows, it reduces stocking costs by allowing hospitals and surgeons to get screws of varying lengths and bores and simply insert them into the other elements of the screw set in order to produce the device. But the testimony was absolutely unequivocal that that is never done. The screws are not sold separately from the receiver chamber and the other elements, and no one ever has reduced any stocking costs. So the point is, as this court pointed out in grain processing, the question is, in trying to get lost profits rather than reasonable royalties, the question is what would have happened in the but-for world? It's their burden to show that in the but-for world, people would have, people wanted the patented invention as opposed to devices that don't practice that patent, and Judge Linn, with respect to all of the elements of the patented claim. And the evidence, it may very well be that proof that of sales, large sales of products that embody the patent, and in this case, the product embodies the patent but also embodies six other patents, that may be evidence of demand for the patented invention. It may be evidence of the absence of non-infringing alternatives. But that evidence can be overcome, and in this case, it not only was, there was a concession that the patented invention was irrelevant to customers. And that's why we are entitled to judgment as a matter of law on lost profits. But even if we weren't, we are certainly entitled to a new trial on this, because we wanted to tell the jury, as grain processing says we are entitled to, what we would have done in a but-for world and why we didn't design around this top-loading feature until the summer of the spring and summer of 2007. And the answer was that we not only had an opinion of counsel in 2000 and in 2001, as we've included in the supplemental appendix, saying that our conical design doesn't infringe, but we had summary judgment by the district court in this case, saying that there was no literal infringement and no infringement by equivalence. And it was only after the latter holding was reversed by this court in 2006, and certainly was denied in 2007, that the testimony showed that we engineered a bottom-loading product beginning in April of 2007 and had 20,000 units ready for use on the eve of trial in September of 2007. And we asked the district court either to allow us to be able to explain through witnesses or to have the court instruct the jury that the court had previously ruled that our design did not infringe. The court denied that ruling and deprived us of the opportunity to prove the but-for world. The court said that that would be prejudicial, but the jury heard all about the fact that there was a prior trial. The jury heard all about the fact that there was a prior appeal. It just didn't hear that the judge had previously said that these vertex screws do not infringe, and that deprived us of explaining to the jury why there was absolutely a non-infringing alternative available, that is, a bottom-loaded version of this screw. But we didn't begin to engineer it and put it into place until after this court reversed the district court on doctrine of equivalence and said that was a triable issue of fact. So we think we're entitled to judgment on lost profits, and we think in any event we are certainly entitled to a new trial in which we can tell the jury why it is that we waited until the middle of 2000 to engineer a bottom-loading design. Now I will pass with the court's indulgence, unless the court has questions on the pull-through damages, I'll just pass to the issue of sanctions. Let's hear from the other side, and we'll save you some time for the next question.  Mr. Griffith, you too may run over if you need extra time. Thank you, Your Honor. May it please the court, this case involves an invention that expanded the market for cervical spinal implants by a factor of 20. It took a market from around $10 million a year to around $200 million a year in the span of a few short years, and that was because of the polyaxial feature of the patented design that enabled surgeons to have the flexibility that they needed in the tight confines of the cervical area. The verdict and judgment in this case reflect the value that the invention had to DePue, to Medtronic, and to the market. I want to address the issues of ensnarement and some issues on pull-through, but I certainly want to respond to the comments concerning lost profits, and then I would like to have some comments on willful infringement. Our briefs describe two threshold issues before you even get to the merits of ensnarement, which include whether Puno is prior art. I'm going to leave that discussion to the briefs. On the merits, Medtronic has not identified any clear error in Judge Harrington's decision, factual decision, decision on the factual issue of teaching away. Puno desired a shock absorber effect, and the addition of the compression member from the Anderson World War II fixator, battleground fixator for legs, would have destroyed that shock absorber effect. To quote their expert, it would have eliminated it, not reduced it, not made it a little less effective. It would have eliminated it. The judge was entirely correct to find a teaching away here. The patent office in March of 2008 reached the same result in the reexamination that they filed based on these references and rejected the combination. There's no clear error here. Medtronic is just re-arguing the evidence. What about the indication or the argument in any event that Puno, while it obviously does disclose the shock absorber effect, it also disclosed rigidity? It disclosed rigidity in the prior art. It said, for example, there's a Steffi patent in plate system. It said that's rigid, and that causes problems for bone and for screw breakage. It causes the bone not to heal properly around the screw, and you can have pullout. It did disclose prior art rigid screws, but there was one and only one embodiment disclosed in Puno, and that had a shock absorber effect to solve the rigidity problem. There were not two embodiments. This is not a case like In Re Gurley, in which the prior art reference disclosed embodiment A and embodiment B. It said embodiment A with the epoxy resin, it's not as good, but it's there. There was no second embodiment disclosed in Puno. There was no rigid embodiment disclosed of the Puno design. The reference to Claim 5 is legally irrelevant. In Re Beno says you may not consider the scope of the claim in evaluating what the reference discloses. What infringes a claim is not coterminous with what the reference discloses. So Claim 5 is irrelevant. As a matter of law, it may not be considered in the obviousness analysis. Now particularly in the face of this clear teaching away, Judge Harrington was entirely correct to consider the, to note the obvious hindsight reconstruction that was going on here in the combination of the World War II battleground device with the Puno spinal implant. And this court has articulated, and the Supreme Court has articulated, the use of secondary considerations to evaluate whether hindsight is going on. They can be a useful indicia of, objective indicia of non-obviousness. And that helps on preventing rank hindsight in doing the analysis. Here the district court found, and there has been no pinpointing of any clear error in this factual finding, that Medtronic copied the patented invention, that the invention was commercially successful, and that there were failure, there was failure of others. Mr. Waxman noted, interestingly I thought, why do you need Anderson? He asked. Why do you even need it? This is so obvious. Well that's an interesting question because their expert, Dr. Foley, was aware in 1991 of the Puno shock absorber screw. And this is in our briefs. He failed to add the compression member even though he said in 1991, and this is not the prior wartime period, but in 1991 he said, I didn't like it. So why not add the compression member to paraphrase Mr. Waxman, why do you need Anderson? Well Dr. Foley did not have an answer to that question. There was a failure of others. Medtronic contends, nonetheless, that KSR and Sundance mandate a factual conclusion of no teaching away in Puno, even though neither of those references, none of those cases discuss teaching away at all. There is no case where in the face of a clear teaching away, a reference was modified in the face of a clear teaching away to change it to what it discouraged the inventor from doing, to what it criticized. On the jury issue, I just want to note that ensnarement is a judge made doctrine. And for that reason, in cases such as Abbott v. Day, this court has said it is a legal determination for the court to decide. Citing Warner-Jenkinson footnote 8, which says that the various legal limitations on the doctrine of equivalence are for the court to decide. And it gives a rationale for that, to prevent black box jury verdicts. This is a means by which the court can prevent the jury from going too far with the doctrine of equivalence. It is a legal determination for the court to decide. Does it mean that you can't possibly put it to the jury for an advisory verdict? That could be done, but it does not need to be done. It is for the court to decide. In an Abbott v. Day, by the way, the ensnarement issue decided as a matter of law, included in the anticipation issue, which is not, as a defense, a question of law. Obviousness is a mixed question of law, in fact. Anticipation is not. But yet, that was decided as a matter of law in Abbott v. Day. On? Mr. Griffith, could you turn to the pull-through damages? Yes, Your Honor. And I'm having some difficulty with that, in the sense that it seems to me your theory is that your entitlement to lost profits extends to sales, as I gather you're arguing, sales resulting from customer relationships. It is not from customer relationships. It's from opportunities. From opportunities that we know have been obtained. Isn't that what your expert said, Dr. Niels? It enables one to establish customer relationships. But what he was getting at, and I believe what he testified to, and this is the main point, is that this new technology gave DePue and Medtronic the opportunity to get into accounts that they did not have access to otherwise. Surgeons are hard to gain access to. And it is true, Your Honor, that the relationship that a sales or technical service representative has with a surgeon is a very crucial, close thing. But for that reason, surgeons, you don't have a lot of sales representatives. They don't go to a store to buy spinal implants and walk down an aisle and get them. So companies don't easily get into a surgeon account. They don't have that much time. So when you develop a relationship with a surgeon and gain access to that opportunity to sell to the surgeon, that gives you the opportunity to sell a variety of products. Here, this technology was entitled to base a damages claim on any and all sales, no matter how remote they might be from the patented product, that because that you got your foot in the door, and but for the infringement, et cetera, that would not have been the case, well, then you're entitled to some piece of that action. That seems to be a very, very sweeping reach, which strikes me as inconsistent with right height and American seating. I think the answer to your question of is one entitled to that, no matter how remote, the answer is absolutely not. These damages have to be reasonably foreseeable. And here, not only were these damages and these losses reasonably foreseeable, but they were foreseen by both parties in connection with the introduction of this technology. I would refer the court, for example, to there's various documents and we've cited them in our brief, but page 12129 of the joint appendix where they discuss, Medtronic discusses getting into the University of Pennsylvania account, where they've been closed out of, and they're going to be able to get in there because of the Vertex product. And by virtue of that, they're going to gain access to other surgeons in that account. Now that is the very sort of opportunity that Medtronic would not have had, but for the infringement, and that DePue would have had, but for the infringement. That pull through that they realized by getting into the University of Pennsylvania account is an opportunity that DePue would have had by the technology. Pull through was a recognized phenomenon by the marketing people at DePue and the marketing. Excuse me for interrupting, but wouldn't that same argument have sort of carried the day for enhanced damages in right height and American seating? There you had products that were quite related to the patented product in question, and yet those were not available. In American seating and in right height, the patentee relied on the entire market value rule to prove up foreseeability and causation in effect. In other words, by virtue of asserting the entire market value rule, they can almost get per se foreseeability. But the fortuity of having, and because there was not a functional relationship, they couldn't avail themselves of the entire market value rule. But they did, if they had not availed themselves of the entire market value rule and come up with a different theory, they might have been able to show causation and foreseeability. They didn't do that. They were trying to argue effectively by mere presence of the same products and the same invoices or in the same bids. By mere fortuity of that, they met the entire market value rule, and you don't. And so they were rejected. But that doesn't foreclose other formulas for approaching damages. But this is a new theory, and do you have any case support whatsoever for this sort of customer relationship theory? It's not merely a customer relationship theory. I think it is a little unique to the circumstances of this case. It would be a better expression that you feel more comfortable with. Well, pull through. All right. I think that there are things that are like it. And for example, the micro-ingredients, I'm not getting the right name, it's microchemical, thank you, case involves micro-ingredients that went with the patented machine. They weren't sold with the patented machine. The customer didn't have to buy them with the patented machine. They could buy the micro-ingredients from anyone that they wanted to. Now, you could debate whether the micro-ingredients are functionally related to the machine or not. They're certainly not a component in the machine. They're what the machine acts on. But they could be obtained by anyone. And that case allowed a lost profits approach on the micro-ingredients, even though they may be bought remotely in time from the purchase of the machine. But this court has held repeatedly that the calculation of damages and the termination of damages is case-specific and fact-specific. And I think this is a very case-specific and fact-specific situation. But the fact that it is doesn't mean that we're precluded from pursuing damages. I think the Morris case indicates that new damages theories or case-specific damages theories may arise, and that's entirely appropriate. On the subject of lost profits, I simply want to quickly note that we used the exact same approach for lost profits on patented products in this case that we used in the prior case. There was no objection to that approach in the prior case. It was a standard Panduit approach as modified by state industries and market share. Decades of case law say that demand for the patented product may be proven by sales of the patented product. And in terms of the issue about not being able to describe the summary judgment ruling to the jury, the case has been infringing for around eight years. That summary judgment decision took place or existed for approximately two and a half years of that time period. It didn't exist in 2000 when they evaluated a bottom loader and decided not to use it because it was not as good. Surgeons did not like it. So in 2000, that had nothing to do with the decision to abandon it. And after November 2006, when this court's decision came out, they didn't go back to that design or any of the earlier bottom loader designs. They went to an entirely new design for which they filed a patent application in September 2008, a week before trial. It was not a design that was available at any time during the damages period. They had to invent it. And I would point out cases such as microchemical say in that sort of circumstance, the design is not available. Might it have been acceptable? It might have been. It wasn't available. Nobody knows. There's been no evidence about that product and how customers reacted to it. There was evidence about the two bottom loader designs that they came up with during the damages period. We presented that to the jury and the evidence was that from Medtronic's own files that surgeons did not like those designs. They were too weak or they were too bulky for the cervical area. Was that something to do with the fact that it was bottom loaded or was that? Yes. What is it about a bottom loader design that makes it too weak? The problem Medtronic had with that bottom loader design was in the 2000-2001 time frame it was too bulky. So when you put it, screw it from the bottom, you have to deal with different dimensions. It's the idea that you have to make a hole large enough for the screw to get through where it's top loaded. You don't? Help me with this because I'm not sure I understand. It's difficult for me to describe with my hands, but the dimensioning changes when you do the bottom loading and the cervical area was very sensitive to these tight confines in a way that the lower back is not. So Medtronic introduced a bottom loader design for the lower back in around the 2000 time frame, but at the same time they couldn't do it in the cervical because it was too bulky. When they got the size down it was too weak and it didn't test out well. So that was the evidence on that. Now they eventually came up with an entirely new approach for making a bottom loader involving a sleeve and that was the one that they patented or sought a patent for in September 2008, but that was not available earlier. Mr. Griffith, you are arguing that Judge Harrington was wrong in granting J Maul of no willfulness. Yes. What evidence in this case shows an objectively high risk of infringement? Medtronic deliberately copied a patent invention of a competitor. That is objectively risky behavior of the highest order. They then went to, so... Well, of course, you know, this is always the case. Are your actions in designing around a patent okay or are your actions in copying and trying to make it look like you're not copying bad? It's the same conduct. You see a patent, you make a change, and one side argues you're trying to get away with something and the other side argues you're copying. That's a good question, Your Honor. The sequence is important. They copied in 1993. They went to Patent Council and he said, quote, that's a troublesome, that patent is a troublesome roadblock. They dropped it. But patent lawyers say that all the time. They don't say that all the time. And in fact, that's what happens when companies that are trying to be sensitive about patent rights do the investigations they're supposed to do and they make preliminary assessments that, well, this is troublesome, this one is not troublesome, and then they go beyond that. And there were some changes made and there were some efforts made to address that troublesome situation. That doesn't necessarily reflect an objectively high risk of infringement, though, does it? Well, in this instance, I believe it is. Let me continue with the sequence, Your Honor. He did call the patent a troublesome roadblock. With full knowledge of that design, he said, there are some designs, however, that might not infringe these patents. If you come up with one, let me know. So clearly he thought this design infringed. It was a literal infringement. It had a spherically shaped portion. This was not the redesign. This was not the conical vertex. In 1999, they go back to vertex after they've dropped it for a period of time. And they get another opinion of counsel in 2000. And they submit pictures of a spherical vertex receiver with a spherical screw head. The patent lawyer looking at that says, I assume you're not making that. I assume what you're actually making is, he described a design that, in fact, was structurally the same as the MAS screw that was previously before the court in the prior appeal. In fact, that is not what Medtronic was doing. They introduced the screw with a spherically shaped portion, a literal infringement. After the litigation was filed, after the litigation was filed, a lawyer told them, you should switch to conical. It'll look better. And then they got an opinion of counsel concerning that. But that happened after the introduction of vertex. And the change to conical was many years after the original copying and after they had been told of the problems they had. That's why we say this was objectively risky behavior. And we would point to cases such as the Minks case, which do indicate that deliberate copying can be highly pertinent to the question of willful infringement. And that finding of willfulness was affirmed in that case. Thank you, Your Honor. Any more questions, Mr. Griffin? No questions? OK. Thank you, Mr. Griffin. Mr. Rothschild? I have just a very few points to make on ensnarement, rebuttal on ensnarement and lost profits. And then I definitely want to address the willfulness point that was raised. There's nothing on ensnarement. There's nothing hindsight about what was going on here. Professor Antonsen, their witness, testified that Puno included all of the elements of the hypothetical claim except the compression member. And he said combining Puno with Anderson would have produced, and these are his words, a predictable outcome of a rigidly locking pedicle screw encompassed by the hypothetical claim. The notion that there are, whether secondary considerations are or aren't relevant in an issue, the fact of the matter is this court in Sundance, I think it's Sundance, and the Supreme Court in KSR have made clear that secondary considerations are at most relevant evidence of obviousness. But they can't disprove the obviousness of a, quote, predictable mechanical combination, which is exactly what we have here. As to these allegations of copying, I think Judge Lin's question got at this point, but the district judge did not find that the patent was copied. All you have to do is look at the drawings and the patent and the device that we manufactured. What the judge said is, and it's at page A36, the defendants relied on the 678 patent and tried unsuccessfully to design around it. Now, I want to get back to that when I talk about willfulness. But first, let me just say that Mr. Griffiths says, well, there's no case in which there was a patent prior reference that teaches a way that was somehow overlooked in an obviousness finding. First of all, this is not an issue of modifying a prior reference. It's that a person of ordinary skill in the art looks at all of the field to determine whether there is a reason to combine. And in addition to Rentrop, this court's decision in Dystar is also solid authority for that. In any event, as KSR, in KSR, the Supreme Court explained its earlier ruling in Adam's Fruit, which was the companion to Graham and involved teaching away, and said that teaching away defeats obviousness only if the combination of old elements turns out to work in a, quote, unexpected manner. Now, as to lost profits. Could it go before we leave in Stairman? This is a question of how the device works. And it may just not be sufficiently clear from the materials. But I ran into trouble on it. If you have your brief there, page 6 of your brief has a picture of Anderson. And in particular, I would call your attention to figure 5 and item 15, which is listed as the compression member. And I cannot see how that operates in a way that's analogous to the compression member in the patented device. Can you give me just a very brief explanation for how that is analogous to the compression member? Or is there some place you can point me to in the writing that would have that material? There, Professor Anderson and our expert, Professor Oxlund, both explained this in detail. All right. But the short answer is, it is essentially a washer that sits on top of the ball, which is sitting on top of the socket. And in Anderson, pressure is applied to the washer that is the compression member, which is transferred to the screw. In that case, it was a bolt that provides rigidity in exactly that way. And I'm afraid that's the best I can do. But the two experts absolutely agreed on this. Now, with respect to lost profits, this notion that the bottom-loaded screw was too bulky and that's why it wasn't done, because I think Your Honor's question was, maybe the receiver chamber has to be big enough to put it through. The testimony was that these are all pre-installed. The size of the chamber doesn't change whether it's bottom-loaded or top-loaded. And the testimony in the case, there was a lot of conflicting testimony about whether they were trying to do anything seriously in 2000 or 2003. But there was no doubt that when they decided to do the bottom-loading workaround, they began in April of 2007. And they had made 20,000 versions of it and tested it by the time trial started in September of 2007. And the notion that, well, there couldn't be reliance on the district court's ruling of non-infringement in 2004 because they started making these devices in 2001 is just wrong on two counts. First, from the time the district court granted summary judgment of non-infringement, we were absolutely entitled to continue to sell that device and had every reason not to try and work around the design. But more to the point, at trial, they attacked the 2000 and 2001 opinion letters over and over and over and over again as being unreasonable. And there was no better proof of the reasonableness of the opinions expressed in those two counsel letters than the trial court's actual judgment. Now, with respect to willfulness, I think our point about the absence of any objective willfulness with respect to the vertex product accused, which is the conical receiver chamber, I have nothing to add in this case. This has belt suspenders and absolutely everything else. It's got an opinion letter. It's got summary judgment. This court agreed no literal infringement. On remand, JMOL was denied. There was the trial court held a hearing on ensnarement and said that the question was close and it was well tried. And the patent office ordered re-exam on the validity of the patentability, finding a substantial question of patentability. That is objective willfulness personified. Now, they, in their reply brief on their cross-appeal, and we're probably going to hear about it when Mr. Griffith gets up and talks about the spherical. This really isn't rebuttal, but we'll take this issue on the briefs. OK, we didn't have a chance to rebut their assertions on this so-called spherical vertex, which came up only in their fourth brief. If the court would indulge me, I'd just give you a quick answer on why.  OK, the only vertex product that was ever found to infringe is conical. There was never a finding that a spherical version of this product was ever infringed a patent. The arguments that are made in their gray brief were made to Judge Harrington, both in support of willfulness and sanctions. He rejected them, and properly so, because although in 2000 and early 2001, there were a limited number of these spherical products sold as special order versions of the CD screw, which is a lumbar screw. Prior to the first trial, and I'll cite to the court to pages 1062 to 1073 of the appendix, we disclosed the part numbers of those spherical products, the engineering drawings that showed those products, some of which they presented to this court in the last appeal, and the sales numbers. We actually gave them the number of sales we made of that spherical product. They chose not to accuse it, probably because the numbers were so small and we were making a conical version. Even on remand from this case, from this court, on retrial, they did not seek a finding of infringement. And whether or not those spherical products do or don't infringe, and whatever our state of mind was with respect to selling those few special order items, is absolutely irrelevant to whether or not we were objectively or subjectively willful with respect to the adjudicated infringement, which has to do with the conical products. Thank you. Thank you, Mr. Waxman. Now, Mr. Griffith, do you need half a minute? Could I take half a minute, Your Honor? I would point out that pages 1062 to 1063 of the appendix are simply attorney argument that it wasn't that product that Mr. Waxman was just describing wasn't Vertex. The drawings call it Vertex. It was always called Vertex. The sales of it were called Vertex. We accused those sales of infringement at all times. What we didn't know, and what was concealed from us, is that it was a spherical product. And Mr. Waxman mentioned that it was at issue in the prior appeal. Those drawings were included. And what they represented to this court was it wasn't sold. That was what they represented to this court. That's what we had thought. OK. Thank you. We'll do our best to figure it out. Thank you both. The case is taken under submission. All rise.